HUGH A. WELLS, Judge of the North Carolina Court of Appeals (Retired) v. CONSOLIDATED JUDICIAL RETIREMENT SYSTEM OF NORTH CAROLINA, a corporation; BOARD OF TRUSTEES OF THE TEACHERS' AND STATE EMPLOYEES' RETIREMENT SYSTEM OF NORTH CAROLINA, a body politic and corporate; and THE STATE OF NORTH CAROLINA

No. 156A00

(Filed 9 November 2001)

## Pensions and Retirement— overlapping judicial and executive service

The Board of Trustees of the Teachers' and State Employees' Retirement System of North Carolina (TSERS) did not err by suspending plaintiff's benefits under the Consolidated Judicial Retirement System of North Carolina (CJRS) where plaintiff was appointed Chair of the Utilities Commission after retiring from the judiciary. TSERS was created in 1941, CJRS was created in 1974, and the General Assembly eventually codified the Retirement System in Chapter 35 of the General Statutes, incorporating both TSERS (Article 1) and CJRS (Article 4). N.C.G.S. § 135-52 mandates that the provisions of Article 1 affect the benefits of CJRS members who return to service, and Article 1 prohibits simultaneous contribution to TSERS and receipt from the Retirement System. Article 4 contains no exception to that principle; N.C.G.S. § 135-71 addresses only retired CJRS members returning as contributing members of CJRS. Statutory amend-

ments and the Board's long-standing administrative interpretation strengthen this construction.

Justice ORR dissenting.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 136 N.C. App. 671, 526 S.E.2d 486 (2000), affirming a judgment entered 29 March 1999 by Cashwell, J., in Superior Court, Wake County. On 4 May 2000 the Supreme Court granted discretionary review of additional issues. Heard in the Supreme Court 13 September 2000.

*Boyce & Isley, PLLC, by G. Eugene Boyce, Philip R. Isley, and Laura B. Isley; and Schiller Law Firm, LLP, by Marvin Schiller and David G. Schiller, for plaintiff-appellant.*

*Michael F. Easley, Attorney General, by Alexander McC. Peters, Special Deputy Attorney General, for defendant-appellees.*

MARTIN, Justice.

Plaintiff served on the North Carolina Utilities Commission (NCUC) from 1 January 1970 to 30 April 1975 and from 1 July 1977 through 17 August 1979. During his tenure at the NCUC, plaintiff was a member of the Teachers' and State Employees' Retirement System of North Carolina (TSERS).

Plaintiff served as a judge on the North Carolina Court of Appeals from 29 August 1979 to 30 June 1994. During his tenure at the Court of Appeals, plaintiff was a member of the Consolidated Judicial Retirement System of North Carolina (CJRS).[1] His judicial retirement benefits vested in August 1984, following five years of creditable service. Upon his retirement from the judiciary in 1994, plaintiff applied for and received a judicial service retirement allowance from the CJRS for the month of July 1994.

In July 1994 the Governor of North Carolina appointed plaintiff as Chair of the NCUC. As a result of this appointment, plaintiff again received a monthly salary from the State of North Carolina and again became a member of the TSERS. Plaintiff's monthly CJRS retirement

---

1. The name of the Judicial Retirement System was changed in 1985 from the "Uniform Judicial Retirement System" to the "Consolidated Judicial Retirement System." Except where otherwise noted, our references to the "CJRS" apply generally to the Judicial Retirement System and not to the system in place at any particular time.

allowance was suspended from August 1994 through December 1996 during his service as Chair of the NCUC. On 31 December 1996 plaintiff resigned from the NCUC, and his CJRS retirement allowance was restored effective 1 January 1997.

On 30 September 1997 plaintiff brought suit against the CJRS, the Board of Trustees of the TSERS (Board), and the State of North Carolina on the ground that he was entitled to receive his monthly retirement allowance under the CJRS while he was earning a salary as Chair of the NCUC and contributing to the TSERS. On 5 June 1998 an administrative law judge determined that plaintiff's judicial retirement allowance was properly suspended while he worked at the NCUC. On 4 August 1998 the Board accepted that recommendation and entered its final agency decision. On 29 March 1999 the trial court affirmed the final agency decision and entered summary judgment in favor of defendants.

On 7 March 2000, the Court of Appeals, in a split decision, affirmed the trial court. *Wells v. Consolidated Jud'l Ret. Sys. of N.C.*, 136 N.C. App. 671, 526 S.E.2d 486 (2000). The Court of Appeals held that the Board properly suspended plaintiff's retirement allowance for the period of time he served as Chair of the NCUC. *Id.* at 677, 526 S.E.2d at 491. The majority based its decision on an interpretation of the interplay of several statutes elaborating the TSERS and the CJRS. *Id.* at 673-77, 526 S.E.2d at 488-91. Judge Horton dissented on the grounds that the "restored to service" provision in Article 1 of the Retirement System applied only to retirees under the TSERS and could not be applied to plaintiff, a retiree under the CJRS. *Id.* at 678, 526 S.E.2d at 491 (Horton, J., dissenting).

The General Assembly codified the Retirement System within Chapter 135 of the General Statutes of North Carolina. Chapter 135, entitled "Retirement System for Teachers and State Employees; Social Security; Health Insurance Program for Children," incorporates, among other things, both the TSERS in Article 1 and the CJRS in Article 4. The General Assembly enacted Article 1 in 1941 and Article 4 in 1974. Because this case turns upon the interpretation of and interplay among sections within Chapter 135, it is instructive to set out preliminarily the provisions of the CJRS in Article 4 and the

TSERS in Article 1 relevant to our inquiry.[2] At the time plaintiff retired and received his first judicial retirement check under the CJRS, Article 4 provided in pertinent part:

> The retirement benefits of any person who becomes a justice or judge on or after January 1, 1974, shall be determined solely in accordance with the provisions of this Article.

N.C.G.S. § 135-51(c) (1981). Also, section 135-71 of Article 4 provided at that time:

> In the event that a retired former member should at any time return to service as a justice or judge, his retirement allowance shall thereupon cease and he shall be restored as a member of the Retirement System.

N.C.G.S. § 135-71(a) (1981). At the time plaintiff's benefits vested, Article 1 provided, in pertinent part:

> Should a beneficiary who retired on an early or service retirement allowance be restored to service for a period of time exceeding six calendar months, his retirement allowance shall cease, he shall again become a member of the Retirement System and he shall contribute thereafter at the uniform contribution rate payable by all members.

N.C.G.S. § 135-3(8)(c) (Supp. 1983).

Our review of the statutory scheme leads us to conclude that the legislature anticipated the possibility that recipients under the Retirement System might return to active employment on behalf of the State of North Carolina. See N.C.G.S. § 135-3(8)(c) (Supp. 1983); N.C.G.S. § 135-71(a) (1981). If a former member of the TSERS is restored to service as an employee or teacher, N.C.G.S. § 135-3(8)(c) provides for the cessation or suspension of retirement benefits while the person contributes to the TSERS. The retirement allowance of a former member of the CJRS who returns to active judicial service is likewise suspended under N.C.G.S. § 135-71.

The narrow question presented by this appeal is whether plaintiff's monthly CJRS retirement allowance was properly suspended

---

2. We apply the version of our General Statutes in effect when plaintiff's retirement benefits vested in August 1984. See *Faulkenbury v. Teachers' & State Employees' Ret. Sys. of N.C.*, 345 N.C. 683, 690, 483 S.E.2d 422, 427 (1997); *Simpson v. N.C. Local Gov't Employees' Ret. Sys.*, 88 N.C. App. 218, 224, 363 S.E.2d 90, 94 (1987), *aff'd per curiam*, 323 N.C. 362, 372 S.E.2d 559 (1988).

during his active employment as Chair of the NCUC. Stated alternatively, the question is whether a contributing member of the TSERS can simultaneously draw a retirement allowance from the CJRS. We affirm the Court of Appeals and hold that the Board properly suspended plaintiff's retirement allowance during his service as Chair of the NCUC.

Section 135-52 makes the provisions of Article 1 applicable to the other articles in Chapter 135. N.C.G.S. § 135-52 (1981). That section provides in relevant part as follows:

> References in Article 1 of this Chapter to the provisions of "this Chapter" shall not necessarily apply to . . . Article [4]. However, *except as otherwise provided in this Article, the provisions of Article 1 are applicable and shall apply to and govern the administration of the Retirement System established hereby.* Not in limitation of the foregoing, the provisions of G.S. 135-5(h), 135-5(n), 135-9, 135-10, 135-12 and 135-17 are specifically applicable to the Retirement System established hereby.

N.C.G.S. § 135-52(a) (1981)(emphasis added). This section mandates that the provisions of Article 1, including the "beneficiary return to service" provision of N.C.G.S. § 135-3(8)(c), affect the benefits of CJRS members who return to service as employees, "except as otherwise provided" by Article 4. *Id.*

Article 1, section 135-3(8)(c) prohibits simultaneous contribution into the TSERS and receipt from the Retirement System. N.C.G.S. § 135-3(8)(c) (Supp. 1983). An examination of Article 4 reveals no exception to that principle. Plaintiff argues that section 135-71 provides such an exception. That section contemplates only an individual's return to service "as a justice or judge." Section 135-3(8)(c), on the other hand, refers to all returning "beneficiaries." "Beneficiary" is defined in section 135-1(6) as "any person in receipt of a pension, an annuity, a retirement allowance or other benefit as provided by *this Chapter.*" N.C.G.S. § 135-1(6) (1981) (emphasis added). The legislature tailored the language of section 135-71 to address only retired CJRS members returning as contributing members of the CJRS. In contrast, the language of section 135-3(8)(c) casts a wider net, applying broadly to all recipients of Retirement System benefits under Chapter 135 who return as contributors to the TSERS. N.C.G.S. § 135-3(8)(c) (Supp. 1983); N.C.G.S. § 135-71 (1981). Plaintiff fits squarely into this latter category.

Our interpretation of N.C.G.S. § 135-3(8)(c) is further strengthened by review of amendments to that section since 1984, when plaintiff's entitlement to a retirement allowance vested. Later statutory amendments provide useful evidence of the legislative intent guiding the prior version of the statute. *See Childers v. Parker's, Inc.*, 274 N.C. 256, 260, 162 S.E.2d 481, 484 (1968) (an amended version of a statute may not necessarily be a departure from the old law but rather a clarification of what was previously intended). The present version of N.C.G.S. § 135-3(8)(c), recodified as Article 1, Section 135-3(8)(d), provides, in part, as follows:

> Should a beneficiary who retired on an early or service retirement allowance *under this Chapter* be restored to service as an employee or teacher, then the retirement allowance shall cease as of the first of the month following the month in which the beneficiary is restored to service and the beneficiary shall become a member of the Retirement System and shall contribute thereafter as allowed by law at the uniform contribution payable by all members.

N.C.G.S. § 135-3(8)(d) (1999) (emphasis added). The addition of the words "under this Chapter" as a qualifier to "early or service retirement allowance" clarifies that this provision was intended to apply to each of the articles within Chapter 135.

Relying on Judge Horton's dissent, plaintiff further argues that an interpretation of N.C.G.S. § 135-3(8)(c) that covers judges in Article 4 renders N.C.G.S. § 135-71 meaningless. Plaintiff argues that section 135-71, by its very terms, is an exception to section 135-3(8)(c), specifically directed only at members of the CJRS who return to service in a position included in the Chapter. *See Wells*, 136 N.C. App. at 682, 526 S.E.2d at 494 (Horton, J., dissenting).

Section 135-71 was intended to, and does, apply to one specification: when a retired member of the CJRS returns to active membership *in the CJRS*. Section 135-71 therefore effects a valid legislative purpose. The definitional precision of section 135-71 leaves no room for the inclusion of judges who elect to become contributing members of TSERS. Accordingly, section 135-71 does not act as the type of exception contemplated by section 135-52. Rather, N.C.G.S. § 135-3(8)(c) applies to Article 4 and prevents plaintiff from drawing a retirement allowance from the CJRS while contributing to the TSERS.

Plaintiff contends that the absence of N.C.G.S. § 135-3(8)(c) (designated as subsection (8)(d) in the 1994 version of the statute) from the list of six statutory provisions specifically referenced in N.C.G.S. § 135-52 indicates that the legislature intended N.C.G.S. § 135-3(8)(c) not to apply to Article 4. This interpretation is without merit because it ignores the words "not in limitation of," which indicate that the list of specifically applicable provisions is not exclusive. N.C.G.S. § 135-52.

Plaintiff further contends that application of N.C.G.S. § 135-3(8)(c) to CJRS recipients is inconsistent with the requirement of N.C.G.S. § 135-51 that the retirement allowance of any judge be determined solely in accordance with the provisions of Article 4. N.C.G.S. § 135-51(c). According to plaintiff, this inconsistency provides an exception to section 135-52. We disagree. The suspension of a monthly retirement allowance when a retiree again becomes a contributing member of the Retirement System is not inconsistent with Article 4. Service retirement benefits under the CJRS were, and still are, determined in accordance with sections 135-58 and 135-71(b) of Article 4. N.C.G.S. § 135-58 (1981 & 1999); N.C.G.S. § 135-71(b) (1981 & 1999).

We emphasize that the agency established to administer the retirement statutes has adhered to the same interpretation on this matter since the 1970s, which was corroborated in the deposition of Timothy Bryan, Deputy Director of the Retirement Systems Division of the Department of State Treasurer. *See, e.g.,* *Thornburg v. Consolidated Jud'l Ret. Sys. of N.C.*, 137 N.C. App. 150, 150-51, 527 S.E.2d 351, 352 (2000) (observing suspension of Judge Thornburg's CJRS retirement benefits by CJRS officials during his service as Attorney General of North Carolina from 1985 through 1992). The legislature is presumed to act with full knowledge of prior and existing law. *Polaroid Corp. v. Offerman*, 349 N.C. 290, 303, 507 S.E.2d 284, 294 (1998), *cert. denied*, 526 U.S. 1098, 143 L. Ed. 2d 671 (1999). When the legislature chooses not to amend a statutory provision that has been interpreted in a specific way, we assume it is satisfied with the administrative interpretation. *Id.* Nevertheless, it is ultimately the duty of courts to construe administrative statutes; courts cannot defer that responsibility to the agency charged with administering those statutes. *State ex rel. Util. Comm'n v. Public Staff*, 309 N.C. 195, 306 S.E.2d 435 (1983).

This does not mean, however, that courts, in construing those statutes, cannot accord great weight to the administrative interpreta-

tion, especially when, as here, the agency's position has been long-standing and has been met with legislative acquiescence. *Polaroid Corp.*, 349 N.C. at 303, 507 S.E.2d at 294 (citing *State v. Emery*, 224 N.C. 581, 587, 31 S.E.2d 858, 862 (1944)); *see Frye Reg'l Med. Ctr., Inc. v. Hunt*, 350 N.C. 39, 45, 510 S.E.2d 159, 163 (1999) (holding that the interpretation of a statute given by the agency charged with carrying it out is entitled to great weight). Moreover, according great weight to the administrative interpretation in the face of legislative acquiescence is all the more warranted when, as in the instant case, the subject is a complex legislative scheme necessarily requiring expertise. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 129 L. Ed. 2d 405, 415 (1994).[3]

In upholding the Board's long-standing administrative interpretation, we express no opinion concerning the wisdom of the statutory prohibition on "double-dipping"—as this public policy determination was properly resolved by the General Assembly. *See In re Appeal of Philip Morris U.S.A.*, 335 N.C. 227, 231, 436 S.E.2d 828, 831 (1993) (whether to prohibit or allow contingent fee arrangements for private tax auditors is a public policy determination for the General Assembly), *cert. denied*, 512 U.S. 1228, 129 L. Ed. 2d 2726 (1994); *State v. Ballance*, 229 N.C. 764, 767, 51 S.E.2d 731, 733 (1949) ("[A] court is not concerned with what the law ought to be, but its function is to declare what the law is."). In any event, if the legislature chooses to permit "double-dipping" by those individuals who receive judicial retirement benefits and who return to active service as state employees, it may do so. *See Martin v. N.C. Housing Corp.*, 277 N.C. 29, 41, 175 S.E.2d 665, 671-72 (1970) (holding that the General Assembly is to establish the public policy of this state). Indeed, it is clear from the ratification and subsequent repeal of N.C.G.S. § 135-72 that the legislature knows how to modify the administrative interpretation of a retirement statute when it wishes to do so.

For the reasons stated, the Court of Appeals properly affirmed the trial court's decision to affirm the Board's suspension of plaintiff's CJRS benefits during his service as Chair of the North Carolina Utilities Commission from 1 August 1994 through 31 December 1996.

---

3. We recognize that, when the language of the statute is clear and unambiguous, the court must give effect to its meaning because the plain language evincing the intent of the legislature cannot be evaded by an administrative body or a court under the guise of construction. *See Davis v. N.C. Dep't of Human Res.*, 349 N.C. 208, 212, 505 S.E.2d 77, 79 (1998); *Watson Indus. v. Shaw*, 235 N.C. 203, 211, 69 S.E.2d 505, 511 (1952). The retirement statutes at issue, however, are neither clear *nor* unambiguous.

WELLS v. CONSOLIDATED JUD'L RET. SYS. OF N.C.

[354 N.C. 313 (2001)]

AFFIRMED.

Justice ORR dissenting.

The majority in this case strains mightily to construct a statutory rationale for depriving plaintiff, Judge Hugh Wells, of his retirement benefits earned under the Consolidated Judicial Retirement System. Because of his subsequent service as Chairman of the North Carolina Utilities Commission, the majority concludes that Judge Wells had to forgo receiving those benefits during that period of time. In its effort to appease a purported legislative intent to thwart such conduct, the majority ignores the plain language of the applicable statutes, applies provisions that have no bearing on benefits earned by plaintiff, and constructs a veritable house of legal cards that is held up more by hot air than substance.

In an overview, this case deals with two separate retirement systems created by the General Assembly over thirty years apart. The Teachers' and State Employees' Retirement System ("TSERS") was passed in 1941 and applied to those two categories of individuals— our public school teachers and state employees. In 1974, the General Assembly created a separate retirement system for members of the judiciary—the Uniform Judicial Retirement System, which was changed in 1985 to the Consolidated Judicial Retirement System ("CJRS"). As would be expected, CJRS has its own independent comprehensive statutory framework for its application and implementation. TSERS was included in Chapter 135 of the General Statutes as Article 1, and years later, CJRS was added to that Chapter as Article 4.

As noted by the majority, plaintiff retired in 1994 after fourteen years as a judge on the North Carolina Court of Appeals. As such, he was eligible for and received retirement benefits under CJRS. Upon being requested by Governor Hunt to chair the North Carolina Utilities Commission, plaintiff accepted that appointment and thereupon was deprived of his right to draw retirement benefits that he had previously earned (including substantial portions that he had contributed himself). The majority says that such a result is mandated by the laws of this state. I strongly disagree and therefore dissent.

The premise relied on by the majority to the effect that N.C.G.S. § 135-52(a) under Article 4 and CJRS as set out below "mandates" that the "beneficiary return to service" provision

of N.C.G.S. § 135-3(8)(c) applies to Judge Wells' case, sinks like an anchor under close examination. The majority's statement is totally conclusory and without foundation.

> (a) References in Article 1 of this Chapter to the provisions of "this Chapter" shall not necessarily apply to this Article. However, except as otherwise provided in this Article, the provisions of Article 1 are applicable and shall apply to and govern the administration of the Retirement System established hereby. Not in limitation of the foregoing, the provisions of G.S. 135-5(h), 135-5(n), 135-9, 135-10, 135-12 and 135-17 are specifically applicable to the Retirement System established hereby.

N.C.G.S. § 135-52(a) (1981 & 1999). This statute controls the interaction between Article 4 and Article 1 but in no way stands as controlling authority for the position taken by the majority. N.C.G.S. § 135-52(a) provides that (1) use of the term "this Chapter" in Article 1 does not necessarily apply to Article 4; (2) Article 1 merely governs the *administration* of CJRS, and only does so if Article 4 fails to provide otherwise; and (3) certain sections of Article 1 dealing with administration of the plan are applicable to CJRS, and by naming these sections specifically, other sections dealing with administration are not precluded from applying.

The effort by those in the majority to expand the reach and scope of Article 1's interplay with Article 4 is critical to their reasoning because they must rely on a provision in Article 1 if they are to successfully deprive Judge Wells of his benefits obtained under Article 4. The provision in question is section 135-3(8)(c) of Article 1 (later amended and recodified as section 135-3(8)(d)), which provides in pertinent part:

Article 1.

Retirement System for Teachers and State Employees.

. . . .

§ 135-3. Membership.

The membership of this Retirement System shall be composed as follows:

. . . .

(8) The provisions of this subsection (8) shall apply to any member whose membership is terminated on or after July 1, 1963 and who becomes entitled to benefits hereunder in accordance with the provisions hereof.

    c. Should a beneficiary who retired on an early or service retirement allowance be restored to service for a period of time exceeding six calendar months, his retirement allowance shall cease, he shall again become a *member* of the *Retirement System* and he shall contribute thereafter at the uniform contribution rate payable by all members.

N.C.G.S. § 135-3(8)(c) (Supp. 1983) (emphasis added).

Even if the effort to apply section 135-3(8)(c) to Article 4 could be done in some sort of general fashion, the specific language of the section clearly precludes it from applying to any benefits received under Article 4 and thus from applying to Judge Wells. First and foremost, the introductory language in subsection (8) categorically applies its terms to any "member" entitled to benefits. "Member" is defined in Article 1 as "any teacher or State employee included in the membership of the System as provided in G.S. 135-3 and 135-4." N.C.G.S. § 135-1(13) (1981 & 1999). Thus, subsection (8) by its very terms does not apply to someone with retirement benefits under CJRS but instead applies only to those deriving benefits under TSERS. The definition of "Retirement System" in N.C.G.S. § 135-1(22) specifically limits this term to the Teachers' and State Employees' Retirement System.

Secondly, the language in (8)(c) relied on by the majority specifically applies to "a beneficiary" *restored* to service as an "employee" or "teacher." The word "restored" is defined as "[t]o put (someone) back in a former position." *The American Heritage Dictionary of the English Language* 1538 (3d ed. 1992). Judge Wells could not be restored as an employee or teacher because the definition of "employee" in Article 1 specifically excludes someone covered under CJRS, and Judge Wells was obviously not a teacher.

Thirdly, N.C.G.S. § 135-3(8)(c) does not apply because a full reading of subsection (c) shows that the purpose of this section is not to prevent a beneficiary like Judge Wells from drawing the retirement benefits he earned under CJRS, after his retirement from that system and while working for the Executive Branch and contributing to

TSERS. *Instead,* the purpose of subsection (8)—from before the time Judge Wells vested and through the present—is to calculate retirement benefits under TSERS when someone restored under TSERS goes back into service and then later re-retires. The fact that Judge Wells served several years under TSERS while Chairman of the Utilities Commission in no way affected any calculation of his benefits earned under CJRS.

The majority makes several efforts to bolster its result. They can be summarily disposed of as follows:

(1) The majority relies in part on the expansive definition of "beneficiary" in N.C.G.S. § 135-1(6) to validate its enlarged scope of application of N.C.G.S. § 135-3(8)(c). However, Article 4 has its own definition of "beneficiary" in N.C.G.S. § 135-53(3), which includes only persons receiving benefits under CJRS. Thus, this definition in Article 4 must prevail over the definition in Article 1, and the Article 1 definition of "beneficiary" does not apply to Judge Wells.

(2) The majority relies on the amendment to N.C.G.S. § 135-3(8)(c) in 1993, which added the language "under this Chapter." The majority says that this clarifies that the provision was intended to apply to each of the articles within Chapter 135 and that Judge Wells was restored as an "employee." However, as previously noted, this section merely serves to clarify the retirement benefits someone receives under TSERS, *after retiring under* TSERS, coming back to work under TSERS, and then retiring again under TSERS. There is no provision that suggests the calculation of a judicial retirement allowance under CJRS changes because of any later benefits earned under TSERS. Likewise, as previously noted, Judge Wells was not *restored* to TSERS because his retirement benefits were based on service under CJRS.

(3) The majority also relies on *Thornburg v. Consolidated Jud'l Ret. Sys. of N.C.,* 137 N.C. App. 150, 527 S.E.2d 351 (2000), to support the proposition that the administrators of the various retirement systems have interpreted the statutes consistent with the majority's position. While *Thornburg* as a case has no relevance to the issue before us, the opinion does include a statement that Thornburg's benefits under CJRS were suspended while Thornburg was Attorney General of North Carolina. That the interpretation of this statute has been interpreted that way for a number of years by the personnel administering the system is not contested. What is contested is whether that interpretation is correct. I conclude that it is not.

What is perfectly clear is that there is absolutely no language in Article 1 or Article 4 that says someone going to work under TSERS loses retirement benefits earned under CJRS while so employed. Article 1 says you cannot retire from TSERS and go back to work under TSERS and still draw a retirement benefit, N.C.G.S. § 153-3(8)(d) (1999); N.C.G.S. § 135-3(8)(c) (Supp. 1983), and Article 4 says you cannot retire from CJRS and go back to work under CJRS and draw a retirement benefit, N.C.G.S. § 135-71 (1999). Nothing says, however, that you cannot move from one retirement system to another and still draw a retirement benefit previously earned.

This Court has stated numerous times that " '[w]hen the language of a statute is clear and unambiguous, there is no room for judicial construction, and the courts must give [the statute] its plain and definite meaning.' " *Smith Chapel Baptist Church v. City of Durham*, 350 N.C. 805, 811, 517 S.E.2d 874, 878 (1999), quoting *Lemons v. Old Hickory Council, BSA, Inc.*, 322 N.C. 271, 276, 367 S.E.2d 655, 658 (1988)). As a necessary corollary, the doctrine of administrative deference has no application to a clear and unambiguous statute. *See Watson Indus. v. Shaw*, 235 N.C. 203, 211, 69 S.E.2d 505, 511 (1952) (interpretation of statute by agency charged with its enforcement entitled to deference only in case of ambiguity); *see also In re Total Care, Inc.*, 99 N.C. App. 517, 520, 393 S.E.2d 338, 340, *disc. rev. denied*, 327 N.C. 635, 399 S.E.2d 122 (1990).

In conclusion, whatever the General Assembly may have intended either in the past or the present, it surely has failed to specifically address by statute the scenario now before us. How very simple to say that a person cannot draw a retirement benefit from *any* retirement system enacted by the state while working for the state. As previously noted, the General Assembly has specifically said that a person cannot draw benefits from TSERS and go back to work under TSERS, and it has specifically said that a person cannot draw benefits under CJRS and go back to work under CJRS. If the General Assembly intended to prohibit moving from one system to another and still draw retirement benefits, it clearly could have said so, but the General Assembly did not. The only relationship between Article 1 and Article 4 deals with the administration of the two distinct systems. Otherwise, each retirement system is independent with different definitions of terms and provisions governing the respective operations. In fact, N.C.G.S. § 135-51(c) specifically says: "The retirement benefits of any person who becomes a justice or judge, district attorney, or solicitor on and after January 1, 1974, or clerk of superior

court on and after January 1, 1975, shall be determined *solely* in accordance with the provisions of this Article." N.C.G.S. § 135-51(c) (1999) (emphasis added).

On 30 June 1994, at the age of seventy-two, Judge Hugh Wells retired after a distinguished career of public service including fourteen years as a judge on the North Carolina Court of Appeals. Having done so, he could have easily retired to his home in Shelby, done nothing, and still draw a monthly retirement income of $5,182, a substantial portion of which he contributed from his salary over the years. He also could have drawn additional salary by becoming "of counsel" to a law firm, by teaching at a private law school, or by engaging in any other type of business in the private sector and still continue to draw his retirement benefits. However, heeding the request of Governor Hunt, Judge Wells opted instead to continue working in public service as Chairman of the North Carolina Utilities Commission, despite a steadily debilitating fight with Parkinson's disease. His salary in this new position was $6,781 per month.

Judge Wells served as Chairman of the Utilities Commission from July of 1994 until December of 1996. As a result, the practical effect of suspending his judicial retirement benefits for that period of two and a half years is that Judge Wells worked full-time for our state in a challenging and difficult position for a net increase in income of less than $1,600 per month over what he could have drawn in retirement income back home relaxing in Shelby. If this is the public policy intended by the legislature, interpreted by the bureaucracy, and endorsed by the majority of this Court, then I find it a poor policy and of little, if any, benefit to the public. The broad result of such a policy is to penalize a public servant of our state willing to move from one branch of our government to another under entirely distinct and separate retirement systems while imposing no such penalty on any other person coming to work in state government with retirement benefits from another state, the federal government, or private industry. All those persons could serve as Chairman of the Utilities Commission without loss of retirement benefits—but, according to the majority, Judge Hugh Wells could not. Judge Wells died on 4 December 2000, having drawn his full judicial retirement for only four years, despite having contributed to the Judicial Retirement System for fourteen years. His commendable service to this state was dutifully noted at his passing. It is now dutifully noted that the retirement benefits he earned and paid for in part will not be paid because he heeded the request of the Governor of this state and

ESTATE OF FENNELL v. STEPHENSON

[354 N.C. 327 (2001)]

chose to continue serving his fellow North Carolinians after retiring from the judiciary.

The majority has misconstrued the law of our state and imputed a bad public policy to the General Assembly. Therefore, I dissent.